NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0575n.06

No. 19-4102

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Oct 07, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| EN HUA ZHU, | ) | |
| Petitioner, | ) | ON PETITION FOR REVIEW |
| | ) | OF A FINAL ORDER OF THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| WILLIAM P. BARR, Attorney General, | ) | |
| Respondent. | ) | **OPINION** |
| | ) | |

BEFORE: MERRITT, MOORE, and GIBBONS, Circuit Judges.

KAREN NELSON MOORE, Circuit Judge. En Hua Zhu petitions this court to review the decision of the Board of Immigration Appeals ("BIA") denying his motion to reopen his immigration proceedings. Previously, Zhu, a native and citizen of the People's Republic of China ("China"), had filed for asylum, withholding of removal, and protection under the Convention Against Torture on the basis of his Christian religion. A.R. at 403–12. Shortly thereafter, the Government commenced removal proceedings against Zhu, *id.* at 518–19, and Zhu conceded removability, *id.* at 209. On October 26, 2009, the immigration judge denied Zhu's application for relief, *id.* at 174, and the BIA dismissed Zhu's appeal, *id.* at 110. We dismissed in part and denied in part Zhu's petition for review. *En Hua Zhu v. Holder*, 528 F. App'x 544, 547 (6th Cir. 2013) (per curiam). Now, Zhu has moved to reopen his proceedings in light of his participation in the China Democracy Party and worsening conditions for pro-democracy advocates in China.

Zhu filed his motion to reopen in September 2018. In support of his motion, Zhu submitted evidence to show a change in country conditions for pro-democracy advocates and to prove his participation in the China Democracy Party. *See* A.R. at 5–20, 37–79. The evidence included several newspaper articles reporting on President Xi Jinping's growing hostility toward pro-democracy activists since taking office in 2012, *id.* at 62–79, and an affidavit by a leader of the Democratic Party of China attesting that Zhu has been involved in pro-democracy activities and that pro-democracy advocates in China are increasingly being targeted and imprisoned, *id.* at 9–15.

On October 15, 2019, the BIA denied Zhu's motion to reopen. *Id.* at 4. Generally, a motion to reopen must be filed within ninety days of the date of entry of a final administrative order of removal. 8 U.S.C. § 1229a(c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2). However, there is no time limit to file a motion to reopen based on changed country conditions supporting the movant's application for asylum or withholding of removal, provided that the movant can point to material evidence that "was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3)(ii). Zhu's motion to reopen came years after a final order of removal was entered against him, and the BIA determined that Zhu failed to show that the changed-country-conditions exception applies in his case.

"The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board." 8 C.F.R. § 1003.2(a). Thus, we review the BIA's denial of a motion to reopen for abuse of discretion, which is limited in this context to decisions "made without a rational explanation, [that] inexplicably departed from established policies, or [that] rested on an impermissible basis such as invidious discrimination against a particular race or group." *Dieng v.*

*Barr*, 947 F.3d 956, 960–61 (6th Cir. 2020) (quoting *Alizoti v. Gonzales*, 477 F.3d 448, 453 (6th Cir. 2007)). Among the reasons why the BIA might deny a motion to reopen are the movant's "failure to establish a prima facie case for the relief sought, [a] failure to introduce previously unavailable, material evidence, and a determination that even if these requirements were satisfied, the movant would not be entitled to the discretionary grant of relief which he sought." *Id.* at 961 (quoting *INS v. Doherty*, 502 U.S. 314, 323 (1992)).

The BIA denied Zhu's motion to reopen for two reasons. First, in its view, Zhu "has not demonstrated materially changed country conditions in China to warrant an exception to the time limit for his motion to reopen." A.R. at 4. Specifically, in the BIA's view, Zhu's evidence did not show a material change in country conditions since Zhu's removal proceedings in 2009. *Id.* Second, according to the BIA, "[Zhu] has not established that he is prima facie eligible for relief from removal." *Id.* In particular, the BIA highlighted Zhu's failure to adduce evidence that pro-democracy activists like himself would be punished for their politically dissident activities in the United States upon their return to China. *Id.* at 4.

As to the first basis, the BIA failed to make the requisite findings supporting it, and as to the second, the Board did not provide a rational explanation for its conclusion. First, with respect to changed country conditions, the BIA concluded that there was "insufficient" evidence that repression of pro-democracy activists had worsened since 2009, but did not make any findings regarding the evidence that Zhu provided in support of this proposition. Accompanying Zhu's motion to reopen were various news articles describing Chinese President Xi Jinping's brutal crackdown against pro-democracy activists, the likes of which have not been seen in decades. *See id.* at 63 (2017 article noting that "[i]n the past five years, [Xi Jinping] has consolidated power,

purged rivals and encouraged a personality cult to a degree not seen since the death of Mao Zedong in 1976"); *id.* at 67 (2017 article reporting on activists' description of "a drastic deterioration in China's treatment of human rights campaigners," with a Human Rights Watch associate regarding it as "the worst since the 1989's crackdown on pro-democracy protests in Tiananmen Square"); *id.* at 70 (2018 statement from Chinese Human Rights Defenders that "Xi Jinping's brutal crackdown on human rights continues"); *id.* at 72 ("Dozens of lawyers, human rights activists and labor organizers have been arrested as part of an ongoing crackdown launched by President Xi Jinping since he came to power in 2012."); *id.* at 74–78 (2018 article describing "[t]he growing reach of China's security apparatus" in repressing pro-democracy protests in Hong Kong). This evidence, assumed to be true on a motion to reopen, *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 317 (6th Cir. 2018), demonstrates that Chinese governmental repression of pro-democracy efforts has not proceeded at a steady pace from 1989 until now, but rather has spiked since 2012. *See Mandebvu v. Holder*, 755 F.3d 417, 427 (6th Cir. 2014) ("Our law does not require that 'changed circumstances' constitute an entirely new conflict in an asylum applicant's country of origin.") (quoting *Vahora v. Holder*, 641 F.3d 1038, 1044 (9th Cir. 2011)); *Luhiso v. Barr*, 787 F. App'x 319, 323 (6th Cir. 2019) ("A change in circumstance is attributable to a country's conditions if the country as a whole becomes more hostile or dangerous."). Of particular relevance here is the repeated observation in Zhu's submitted reports that antidemocratic persecution has not been this severe in decades; ipso facto, the period preceding Xi Jinping's rise to power—such as in 2009, when Zhu was in removal proceedings—saw less persecution than the current period of Xi Jinping's reign.

Assessing Zhu's exhibits, the BIA stated simply that he had "not presented sufficient evidence" that country conditions had worsened relative to the time at which he was ordered removed. *Id.* at 4; *see also id.* ("[T]he evidence of continuing repression in China of pro-democracy activities is insufficient to demonstrate materially changed conditions in China since the respondent's removal proceedings in 2009."). In light of the extensive evidence that Zhu adduced, however, the only way in which the BIA could have arrived at this conclusion was by discrediting his evidence. And in order to discredit this evidence, "the BIA, not this court, must make the determination that [the evidence] is 'inherently unbelievable.'" *Trujillo Diaz v. Sessions*, 880 F.3d 244, 253 (6th Cir. 2018) (quoting *Haftlang v. I.N.S.*, 790 F.2d 140, 144 n.2 (D.C. Cir. 1986)). If no such determination is made, the BIA "must accept as true reasonably specific facts proffered by an alien in support of a motion to reopen." *Id.* at 252 (quoting *Haftlang*, 790 F.2d at 143). This requirement of an on-the-record determination that a petitioner's evidence is inherently unbelievable is not a requirement that the BIA "recite these magic words every time it denies a motion to reopen on evidentiary grounds." *Dieng*, 947 F.3d at 963. But the BIA must, at a minimum, "adequately indicate[] its finding that new evidence was inherently unbelievable." *Id.* In *Dieng*, we recounted how the BIA had made its findings abundantly clear:

> [T]he BIA explained that it gave the new evidence minimal weight because: the affidavits were "self-serving and speculative"; the petitioners' statements concerning changed country conditions were not "based on personal knowledge"; and the letters from petitioners' family members were from "interested witnesses, speculative, and not corroborated with objective evidence." In other words, the BIA found that the petitioners' new evidence was inherently unbelievable. In any event, petitioners failed to substantiate their claim that the "Senegalese government is powerless to stop the [petitioners'] relatives" from performing FGM on Dieng and her daughters.

*Id.* at 963–64 (citations omitted). No such reasoning is evident in the BIA's two-page order denying Zhu's motion. It did not "explicitly find" that the array of reporting on the worsening of conditions for pro-democracy activists in China was inherently unbelievable, "[n]or did it make any findings that would indicate that it reached this conclusion." *Trujillo Diaz*, 880 F.3d at 253. It did not suggest that this evidence was "at odds with other materials" attached to Zhu's motion, *id.* (quoting *Fessehaye v. Gonzales*, 414 F.3d 746, 755 (7th Cir. 2005)), nor did it determine that the reporting "was incompatible with some other incontrovertible piece of evidence," *id.*

"[W]e do not make interpretive leaps on the Board's behalf." *Hernandez-Perez*, 911 F.3d at 319. If the BIA regards evidence of the sharp uptick in China's repression of pro-democracy activists like Zhu as "inherently unbelievable," it must articulate this conclusion. *See id.* ("Though it need not write an exegesis on every contention, the BIA must consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted. Cursory, summary, or conclusory statements are inadequate.") (quoting *Trujillo Diaz*, 880 F.3d at 255). Whether in the form of affidavits or media reports, evidence of changed country conditions must be accepted as true absent such a finding. *Trujillo Diaz*, 880 F.3d at 252. The Board abused its discretion in contravening this rule.

Second, the BIA's distinction between China's regard for anti-authoritarian dissident activity inside and outside its borders "was made without a rational explanation." *Alizoti*, 477 F.3d at 453 (quoting *Balani v. I.N.S.*, 669 F.2d 1157, 1161 (6th Cir. 1982)). As an evidentiary matter, Zhu ably demonstrated that the Xi Jinping government has a keen interest in preserving its interests beyond mainland China. *See* A.R. at 64 (2017 article stating that, unlike a previous Chinese leader, Xi Jinping "has ordered the party and state apparatus to be far more active abroad in defending

6

China's interests"); *id.* at 74 (2018 article describing how China has "tighen[ed] its grip" on Hong Kong and cracked down on pro-democracy activists there). The proposition that Xi Jinping's government might simply disregard Chinese pro-democracy activities abroad is particularly puzzling when applied to Zhu, a U.S.-based dissident who promotes precisely the same "western values" that Xi Jinping has opposed, according to Zhu's exhibits. *See id.* at 63–64 (describing Xi Jinping's "rejection of 'western' political systems"). It strains credulity to assume that a self-proclaimed antiwestern, antidemocratic regime, which has "jettison[ed] the foreign policy mantra of non-interference," *id.* at 64, would give Zhu a pass for his dissident activity outside of China.

In sum, the BIA abused its discretion in concluding that Zhu had failed to adduce evidence of changed country conditions and that he failed to establish a prima-facie case for the relief sought. We note that, although we hold that the BIA abused its discretion in denying Zhu's motion to reopen, this holding is limited. Whether Zhu's underlying application for relief has merit is for the agency to determine. *See Hernandez-Perez*, 911 F.3d at 319 ("We emphasize that, in remanding, we make no determinations on the issues raised or the merits of this application. These are questions for the BIA to decide in the first instance."). We accordingly **GRANT** the petition for review and **REMAND** to the BIA for proceedings consistent with this opinion.